## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

**vs.**

                                            **Case No. 3:00cr45-RV**
                                            **Case No. 3:03cv337-RV/WCS**

**RAY P. POPE,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION ON § 2255 MOTION

This cause has been referred to me for a report and recommendation on Defendant's motion to vacate filed pursuant to 28 U.S.C. § 2255.

**Procedural History**

Defendant was found guilty by a jury on all nineteen counts of the indictment, which included one count of conspiracy to commit wire fraud, money laundering and interstate transfer of fraudulently obtained funds (count 1), fourteen counts of interstate transfer of fraudulently obtained funds, aiding and abetting (counts 2-5, 8-10, and 12-18), and four counts of wire fraud, aiding and abetting (counts 6, 7, 11, and 19). Doc. 190 (judgment), p. 1. He was sentenced to a total term of imprisonment of 97 months. *Id.*, p. 2.

Defendant appealed along with codefendants James Furgeson, Russell

Kaemmerling, Kevin Kelly, Louis Romain, and Scott Hamilton.  As summarized by the

Eleventh Circuit:

> Basically, the scheme offered two types of "high yield, low risk" investment
> programs: (1) the leasing or renting of United States Treasuries and (2)
> the acquisition of international monetary instruments called "Block Fund
> Letters" and "Letters of Credit Purchase Orders."  Both types of
> investments purportedly relied upon the existence of an escrow
> agreement and an escrow agent in order to "safe guard" the investments
> for the investors.  Kaemmerling and Kelly acted as account managers,
> and Pope acted as the escrow agent.  Furgeson, Romain, and Hamilton
> acted as intermediaries who agreed to locate investors in return for a
> commission or a finders fee.
>
> However, most of the investors' money was never invested, and the
> programs in which Defendants-Appellants did invest some of the
> investors' money never worked as represented.  No profits were ever
> realized by the investors, and almost all of the investors lost their initial
> investments.  Rather, the money which Defendants-Appellants received
> from investors was wired to Pope's law firm's account (i.e., the Cordova
> Law Center in Pensacola, Florida), and then, Kaemmerling, Kelly, and
> Pope fraudulently converted the used of the funds for their own purposes.

Doc. 318, p. 3.  The judgments were affirmed.  *Id.*

Defendant Pope filed a motion to dismiss the indictment, the Government

responded, and the motion to dismiss was denied as untimely.  Docs. 326, 327

(supporting memo), 328 (Government response), and 331 (order).  This court also

found: "[f]urther, there is no jurisdictional defect in the indictment, and it was sufficient

to charge the crimes.  McCoy v. United States, 266 F.3d 1245, 1249 (11th Cir. 2001);

Rule 7(c), Fed.R.Civ.P."  Doc. 331, p. 2.  As noted in McCoy, the personal right to be

charged by a grand jury is not jurisdictional, and may be waived.  266 F.3d at 1249 and

n. 3 (quoting Rule 7(b)).

On appeal from denial of the motion to dismiss the indictment, the Eleventh Circuit found the motion was properly dismissed as untimely, but remanded for the court to construe the motion as filed pursuant to § 2255. Doc. 502.[1]  The opinion was filed on July 25, 2003, and issued as mandate on August 25, 2003. *Id.*  Defendant signed his § 2255 motion on August 4, 2003, and the motion references the Eleventh Circuit's opinion of July 25, 2003. Doc. 480, p. 2.  The motion incorporated the substantive grounds raised in the motion to dismiss the indictment, and also set forth new grounds. Doc. 481 (supporting memorandum), p. 2.

The court directed the Government to show cause why the relief requested should not be granted, and advised that ground thirteen was "improperly pleaded and will not be considered by the court." Doc. 485.  The Government filed a response with exhibits. Doc. 534.  Defendant was directed to reply. Doc. 539.

Until then, Defendant had proceeded pro se in this § 2255 proceeding.  Without filing a separate notice of appearance, attorney Michael Gates filed on Defendant's behalf an affidavit, a reply to the Government's response, a motion for summary judgment, and memorandum in support. Docs. 549-552.  The documents are signed by Mr. Gates as attorney for Defendant. *Id.*  The memorandum in support of the motion for summary judgment explains that the motion for summary judgment is based on the same issues included in the motion to dismiss indictment (which was filed pro se), to be treated as a § 2255 motion. Doc. 552, p. 2.  It is argued that the defectiveness of the indictment may be decided as a matter of law, and a decision in Defendant's favor on

---

[1] The order denying the motion to dismiss indictment specifically noted that "[o]nce his direct appeal has been exhausted, the defendant may possibly seek collateral review under Title 28, United States Code, Section 2255." Doc. 331, p. 2.

the issues raised therein (*i.e.,* the issues presented in the motion to dismiss indictment) "would avoid the necessity of consideration of the various other grounds raised by defendant in his § 2255 motion, the indictment having been dismissed as a matter of law." *Id.*, p. 1.  The Government filed a response to the motion for summary judgment. Doc. 558.

Again through counsel, Defendant filed a motion to amend the § 2255 motion, seeking to raise new claims under  Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), either as a new rule or due to attorney error in failing to make the argument under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  Docs. 582 (motion), 583 (memorandum), and 584 (notice of supplemental authority).

Next, Defendant submitted a pro se letter to the clerk, seeking a copy of the docket.  Doc. 590.  Defendant wrote that he was "becoming somewhat concerned about my status as Pro Se in the proceeding." *Id.*  He noted that Michael Gates (Defendant's friend from high school and an attorney) had filed a motion and memorandum on his behalf, but had never filed a notice of appearance, and "they" had decided that Defendant would continue to proceed pro se.  *Id.*  It was represented that Mr. Gates thought he did not have to file anything with the court since he had never filed a notice of appearance.  *Id.*  Defendant also asked whether the case was still assigned to Magistrate Judge Davis.  *Id.*

The clerk wrote a letter in response, indicating the cost for a copy of the docket and advising that the case had been reassigned to me.  Doc. 591.  The clerk did not address the question regarding whether Defendant was considered as proceeding pro

se or through counsel.  *Id.*  Defendant then filed a pro se supplement to his motion to

amend, a motion for release pending action on his § 2255 motion, and a memorandum

in support.  Docs. 592-594.  Most recently, Defendant has filed a pro se motion for

favorable decisions, and a notice of intent to seek mandamus on or before August 6,

2005.  Docs. 619 and 622.

The Government argues that the "failure to formally appear is not some formulaic

'form over substance' issue but resolves the possibility of confusion as to who speaks

for whom and thereby binds the person for whom he speaks."  Doc. 558, p. 1.  This is

absolutely true.  However, while the Court would prefer a separate notice of

appearance, the papers filed by Mr. Gates constituted a formal notice of appearance.

Mr. Gates signed those papers as the attorney for Defendant.  By filing those papers,

Gates became Defendant's attorney in this case and formally entered an appearance

on his behalf.  *See*, Kovilic Const. Co., Inc. v. Missbrenner, 106 F.3d 768, 772 (7th Cir.

1997) ("As a member of the bar, Weissberg's signature was sufficient to bind him to the

representations required by Rule 11(a) whether or not he had filed a formal appearance

form.").[2]

The rules of this court provide:

No attorney, firm, or agency, having made an appearance, shall thereafter
abandon the case or proceeding in which the appearance was made, or
withdraw as counsel for any party therein, except by written leave of court
obtained after giving ten (10) days notice to the party or client affected
thereby and to all other counsel of record.

Local Rule 7.1(F)(1).  Local Rule 11.1(D) provides:

---

[2] This is not to say that there are any Rule 11 concerns in these filings.  But this
is one important reason why the matter of who appears for a party is governed by clear
rules of procedure.

Any party represented in a suit by counsel of record shall not thereafter take any step or be heard in the case in proper person, absent prior leave of court; nor shall any party having previously elected to proceed in proper person be permitted to obtain special or intermittent appearances of counsel.

Local Rule 11.1(D). Mr. Gates has not moved to withdraw as the attorney for Defendant, and therefore he still represents Defendant. Since Mr. Gates still represents Defendant, everything filed by Defendant after Gates entered his appearance is a nullity.

It is not appropriate here, however, to so rule. Defendant's letter of December 16, 2004, plainly shows that Defendant wants Gates to withdraw as his attorney, that Gates agrees, and Defendant wishes to again represent himself pro se as to all subsequent filings. Doc. 590. The purpose of Local Rule 11.1(D) is to protect the party, not the lawyer, and to prevent improper filings. Consequently, the court should consider counsel's arguments along with the claims and arguments raised by Defendant pro se, and order that Mr. Gates has withdrawn as Defendant's attorney.

The motion to dismiss indictment was to be treated as a § 2255 motion, is incorporated into the § 2255 motion, and the arguments are repeated in the motion for summary judgment.[3] The Court therefore looks to the motion to dismiss indictment and supporting memorandum (docs. 326 and 327), the § 2255 motion and supporting memorandum (docs. 480 and 481), and the motion for summary judgment and supporting memorandum (doc. 551 and 552), in addressing Defendant's claims.

---

[3] The summary judgment memorandum expressly states that the same issues were raised in the motion to dismiss indictment. Doc. 552, p. 2. It is clear that they are very similar. Compare doc. 327, pp. 8-9 and 552, pp. 11-12 (both using for analogy a scheme to defraud by selling the Brooklyn Bridge).

Case Nos. 3:00cr45-RV and 3:03cv337-RV/WCS

**§ 2255 Claims**

Defendant asserts that all 19 counts of the indictment were "patently defective." Doc. 481, p. 3.  The essence of Defendant's argument is the absence of any charge of materiality.  In the motion for summary judgment, it is argued that the indictment failed to charge an offense.  It is argued that a decision in Defendant's favor on the indictment grounds would avoid the necessity of reviewing his other claims.  Doc. 551. Specifically, it is argued that materiality was not charged and  the indictment does not indicate what misrepresentations were material.  Defendant relies largely on Neder  v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).  The arguments are addressed in the order presented by the grounds in support of the § 2255 motion.

**Legal Standards Governing the Claims**

The court does not reconsider under § 2255 errors raised and disposed of on direct appeal.  United States v. Nyhuis, 211 F.3d 1340 , 1343 (11th Cir. 2000) (citation omitted).  If an issue was not previously raised and decided against Defendant, on the other hand, it is procedurally barred and will not be reviewed absent a showing of cause and prejudice.  Id., at 1344 (citations and footnote omitted).  Ineffectiveness of counsel can constitute cause, but to establish ineffectiveness the arguments Defendant faults counsel for failing to raise must have been "significant enough to have affected the outcome of his appeal."  Id. (citation omitted).  Moreover, "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim."  Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000) (emphasis by the Court); *see also* Massaro v. United States, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696, 155 L.Ed.2d

714 (2003) (ineffective assistance of counsel is cognizable under § 2255 whether or not it could have been raised on appeal).

Ineffective assistance of counsel is a two part inquiry.  "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and must also "affirmatively prove prejudice."  Strickland v. Washington, 466 U.S. 668, 690, 693-694, 104 S.Ct. 2052, 2066-68, 80 L.Ed.2d 674 (1984).

To establish deficient performance, Defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 686, 106 S.Ct. at 2064.  "The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690, 104 S.Ct. at 2066. "[E]very effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 689, 690, 104 S.Ct. at 2065, 2066.  To satisfy this prong of Strickland, Defendant must show that "no competent counsel would have taken the action that his counsel did take."  Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  There are no rigid requirements, or absolute duty to investigate a particular line of defense.  Id.

Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires

'winnowing out' some arguments, witnesses, evidence, and so on, to
stress others."

261 F.3d at 121 (citations omitted).

Even if counsel's performance was professionally unreasonable:

[A] petitioner must "affirmatively prove prejudice" by showing that
counsel's errors "actually had an adverse effect on the defense."  This
requires a showing of more than "some conceivable effect on the outcome
of the proceeding."  Instead, the petitioner "must show that there is a
reasonable probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different.  A reasonable
probability is a probability sufficient to undermine confidence in the
outcome."  Although this standard is difficult to meet, it is significant that a
petitioner must show only a reasonable probability that the outcome would
have been different; he "need not show that counsel's deficient conduct
more likely than not altered the outcome in the case."  When evaluating
this probability, "a court hearing an ineffectiveness claim must consider
the totality of the evidence before the judge or jury."

Brownlee v. Haley, 306 F.3d 1043, 1059-60 (11th Cir. 2002) (quoting Strickland); United

States v. Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (quoting Brownlee).

The court need not approach the Strickland inquiry in any particular order, or

address both prongs if an insufficient showing is made on one.  466 U.S. at 697, 104

S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of

lack of sufficient prejudice, which we expect will often be so, that course should be

followed."  Id.

**Ground One**

In ground one, Defendant asserts that trial and appellate counsel were

ineffective for failing to seek dismissal of the 14 counts under the National Stolen

Property Act (NSPA).  Doc. 480, p. 5(1).[4]  "In particular, these counts fail to include

---

[4] There are fourteen typewritten pages inserted between pages 5 and 6 of the
form § 2255 motion, which are referenced as 5(1)-5(14).

factual allegations of the underlying scheme or crime that establishes [the] necessary element[s] of the crime charged, and these counts do not incorporate by reference any other count of the indictment that could supply the missing elements." *Id. See also*, doc. 481, pp. 5-6 and doc. 552, pp. 4-14, *citing, inter alia*, United States v. Adkinson, 135 F.3d 1363 (11th Cir.), *after further briefing*, 158 F.3d 1147 (1998).

Additional argument relevant to this claim is also set forth in support of the motion for summary judgment.  Doc. 552.  Defendant argues that the indictment "suggests" that the grand jury was "focused only on the first paragraph of the five-paragraph statute."  Doc. 552, p. 18.  Defendant points out that none of these counts incorporate any other counts, nor do they allege the elements of any of the underlying common law crimes of stealing, conversion, or fraud.  *Id.*, pp. 19-20.  It is argued that the counts are all defective because they do not allege the subsidiary essential elements of the underlying crime.  *Id.*, p. 20.  Defendant focuses upon the common law crime of fraud and relies, *inter alia*, on the Adkinson case.  *Id.*, pp. 21-22.  He argues that application of its rationale is "very basic," as "none of the fourteen interstate transportation of money obtained by fraud counts sets out any of the underlying elements of the crime of fraud [(1) scheme (2) misrepresentation that is (3) material]." *Id.*, p. 22 (brackets in original).

Counts 2, 3, 4, 5, 8, 9, 10, 12, 13, 14, 15, 16, 17 and 18 charged offenses in

violation of 18 U.S.C. § 2314[5] and § 2.[6]  Doc. 2.  Each tracks the language of the first

paragraph of § 2314, which provides that:

> Whoever transports, transmits, or transfers in interstate or foreign
> commerce any goods, wares, merchandise, securities or money, of the
> value of $5,000 or more, knowing the same to have been stolen,
> converted, or taken by fraud . . .

may be fined or imprisoned up to ten years or both.

Count two, for example, charged "[t]hat on or about June 14, 1995, in the

Northern Defendant of Florida and elsewhere," Defendant (and other named

defendants):

> did knowingly and willfully transport and cause to be transported in foreign
> commerce between Pensacola, Florida, and Saint Helier, Jersey, Channel
> Islands, goods, securities, and money, to wit:  United States currency in
> the amount of $500,000.00, which had been invested by Maumary
> Fiduciary, knowing that these funds had been stolen, converted, and
> taken by fraud from Maumary Fiduciary.

Doc. 2, pp. 37-38.  The other § 2314 counts are similarly worded but allege

transportation in interstate commerce or in interstate and foreign commerce.  *Id.*, pp.

28-48.  They each include a date, the places to and from which the goods, securities,

and money (all a specified amount of United States currency over $5,000) had been

transported, and that defendants knew the funds had been stolen, converted, and taken

by fraud by an entity identified in that count.  *Id.*  None of these counts incorporated by

---

[5] Defendant references count 19, and fails to reference counts 8 or 18, but it is
clear his challenge is to the fourteen counts under § 2314.  Doc. 480, p. 5(1).  The 2005
version of § 2314 is unchanged from the statute as it existed at the time of the offenses.

[6] 18 U.S.C. § 2 provides that someone who aids and abets, or causes an act to
be done, is punishable as a principal.

reference the lengthy factual averments of Count One, and none allege any "scheme."
¶¶ 1-113.

Adkinson involved a "unique set of circumstances" not presented here.  The
indictment there charged a conspiracy to commit an offense against the United States
under 18 U.S.C. § 371, alleging five conspiratorial objectives, including bank fraud.  135
F.3d at 1368.  The defendants moved to dismiss the conspiracy count because four of
the five objectives described a bank fraud scheme which, under then binding circuit
precedent, did not state a violation of § 371.[7]  Id.  The court denied the motion to
dismiss, anticipating a change in circuit law because rehearing en banc had been
granted in another case on the issue.  Id., at 1368-69.  The court noted that if there was
not a change in the law, there was an "almost virtual certainty for a mistrial."  Id., at
1369 (quoting the record with added emphasis).  When the Government rested its case,
after five months of trial, the anticipated en banc decision had not yet issued.[8]  Id., at
1369-70 (footnote omitted).  The district court dismissed the bank fraud conspiracy and
denied a motion for mistrial.  Id., at 1370.

On appeal, the Eleventh Circuit found that inclusion of these allegations (which
did not state an offense at the time of the indictment), and dismissal only after the
Government rested, "created a unique set of circumstances which rendered the trial of

---

[7] At the time, "the then-controlling law of this circuit required the United States to
be a victim of a Section 371 conspiracy," but doubt about the continuing viability of that
precedent had been expressed in a case in which rehearing en banc was been granted
on August 12, 1991, before the indictment in Adkinson was returned on September 27,
1991.  135 F.3d at 1368.

[8] The en banc decision, reversing prior circuit precedent, was issued after the
Government rested its case and after the court had entered judgments of acquittal as to
objectives 2-5 of the conspiracy.  Falcone v. United States, 960 F.2d 988 (1992).

Count I fundamentally unfair and denied these defendants due process of law." *Id.*, at
1372 (footnote omitted).  This ruling was primarily based upon the mass of evidence
which had been admitted at trial in support of the counts which were later dismissed.

It was unnecessary for the indictment here to incorporate by reference the
factual averments elsewhere in the indictment.  "An indictment need do little more than
track the language of the statute charged to be sufficient."  Adkinson, 135 F.3d 1375, n.
37 (citation omitted).  While "[a] count does not state an offense if it does not contain all
the elements of the offense charged," "an indictment is generally constitutionally
sufficient if it sets forth the offense in the words of the statute itself, as long as those
words of themselves fully, directly, and expressly, without any uncertainty or ambiguity,
set forth all the elements necessary to constitute an offense under the laws of the
United States."  *Id.*, *quoting*, United States v. Ramos, 666 F.2d 469, 474 (11th Cir.
1982).

Defendant relies upon Adkinson for the proposition that a § 2314 indictment
must allege "an underlying scheme."  Adkinson seems to have so held as to § 2314,
but the case cited for that proposition does not so hold.[9]  135 F.3d at 1378.  More
important, however, in the second stage of this appeal, the court held that "[i]n order to
sustain Adkinson's conviction under 18 U.S.C. § 2314, the record must contain
substantial evidence that Adkinson had (1) knowledge that the money was obtained by

---

[9] Adkinson cites United States v. Ferrara, 571 F.2d 428, 429-430 (8th Cir. 1978)
for this passage.  135 F.3d at 1378.  Ferrara was only making the point that it does not
matter whether the "stealing" occurs before, during, or after the interstate transportation
of the goods.  Indeed, the court there made it clear that, as our circuit has done, *infra*,
the word "stolen" in § 2314 refers to "all felonious takings."  571 F.2d at 429.

fraud; and (2) that he caused it to be transported in interstate commerce."  158 F.3d at

1164.  The court also noted that:

> Section 2314 requires the government to prove that the proceeds are
> illegally or fraudulently obtained, but unlike the mail and wire fraud
> statutes, does not require that the alleged act of interstate transportation
> of those proceeds be "in furtherance" of that scheme.  *See United States
> v. Sheridan*, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946) (statute
> punishes schemes which are complete, but which "utilize the channels of
> interstate commerce to make a successful get away").

*Id.*, n. 32.  The court sustained a conviction for violation of § 2314 in this later stage of

the case, which it would not have done had an allegation of a "scheme" been a

necessary part of the charge.

In other words, to violate § 2314 Defendant did not have to have committed the

fraud himself, and he did not have to engage in a scheme to defraud.  All that was

needed was an allegation that he knew the property was obtained by fraud and that he

transported the property in interstate commerce.

For example, in Lyda v. United States, 279 F.2d 461 (5th Cir. 1960),[10] the court

considered a § 2314 indictment that "charged transportation in interstate commerce of

'stolen goods and merchandies * * * a load of native pecans * * * which * * * Malone and

* * * Lyda then knew * * * to have been stolen.' "  279 F.2d at 464-465.  The court held

that this was "a sufficient allegation of the essential elements of the offense."  279 F.2d

at 465.

---

[10] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit
rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit.  Bonner v.
City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981); Stein v. Reynolds, Inc., 667
F.2d  33, 34 (11th Cir. 1982).

It is not necessary that a § 2314 indictment allege either a "scheme" or the subsidiary elements of the common law offenses.  "To sustain a conviction under this statute it is necessary to prove that the accused transported the goods in interstate or foreign commerce, that the value of the goods so transported was $5,000 or more and that he knew they had either been stolen, converted or taken by fraud."  United States v. Herring, 602 F.2d 1220, 1224 (5th Cir. 1979), *cert. denied*, 444 U.S. 1046 (1980), *quoting,* Johnson v. United States, 207 F.2d 314, 319 (5th Cir. 1953), *cert. denied*, 347 U.S. 938 (1954).  *See also*, United States v. Quintanilla, 2 F.3d 1469, 1474-75 and n. 6 (7th Cir. 1993) (explaining that "[p]articipation in an unlawful scheme to defraud is not an essential element of the offense" in the first paragraph of § 2314; and while the second paragraph requires a "scheme or artifice to defraud," that paragraph "applies only to the interstate transportation of people, not property.") (citation omitted).[11]

Further, an allegation using the statutory term "stolen" is adequate, standing alone, to allege this element of the offense, and the subsidiary elements of "stealing" need not be alleged:

> The term "stolen" as used here is certainly as comprehensive as "theft" which, we have said, "is not like 'larceny', a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile."

Lyda v. United States, 279 F.2d at 464 (citations omitted).

---

[11] In Quintanilla, the count of the indictment under § 2314, paragraph one, *did* allege a scheme to defraud, and this language was deemed to be mere surplusage. *Id.*, at 1475 (citations omitted).  *See also* United States v. Bond, 231 F.3d 1075, 1077-78 (7th Cir. 2000) (discussing Quintanilla and other cases).

Accordingly, it was sufficient to allege, as this indictment did, that one of the elements of the offense was that the property was "stolen, converted, or taken by fraud" without alleging the subsidiary elements of those common law offenses.  This aspect of ground one is without merit.

Defendant also asserts as part of ground one of the § 2255 motion that appellate counsel deceived him regarding appellate proceedings, resulting in the denial of his pro se motion to dismiss the indictment as untimely.  Doc. 480, p. 5(1).  He reasserts this claim with respect to grounds two and three as well.  *Id.*, pp. 5(1)-(2).

Specifically, Defendant asserts that his appellate counsel, Dennis Owens, advised him by letter that he was considering filing a petition for rehearing en banc in the Eleventh Circuit, and told him over the phone that he would seek rehearing.  Doc. 481, p. 4, referencing Memo Ex. A.  Owens wrote a letter to Defendant on July 11, 2002, advising that rehearing had been denied and that they had 90 days to file a petition for writ of certiorari.  Doc. 481, p. 4, referencing Memo Ex. B.   Defendant alleges that this "was a complete falsehood," as the petition for rehearing en banc was rejected as untimely on July 2, 2002, so he had to file his petition for writ of certiorari by August 7, 2002.  *Id.*; *see also*, doc. 502, p. 3 (noting that the opinion was filed on May 9, 2002, and Defendant had 90 days to seek certiorari; making no mention of any motion for rehearing).

This court does not have a copy of the motion for rehearing, the denial of rehearing, or a copy of the docket in the Eleventh Circuit, to determine whether a motion was filed or whether it was timely.  Counsel apparently thought the 90 days

would run from denial of rehearing, since he was still considering a possible petition for writ of certiorari as of September 5, 2002.  Memo, Ex. C.  1.

As set forth above and below, Defendant's challenges to the indictment do not entitle him to relief on the merits, so he cannot demonstrate prejudice to the outcome as to this subsidiary claim of ineffective assistance of appellate counsel.  Moreover, while there is a right to effective assistance of counsel for a "first-tier appeal as of right,"[12] Defendant did not have a right to counsel, whether effective or not, to pursue a discretionary petition for rehearing or to seek certiorari.  *See* Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (no constitutional right to counsel to pursue discretionary appeals or applications for review in the Supreme Court); Wainwright v. Torna, 455 U.S. 586, 587-88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982) (citing Ross, finding that since defendant had no constitutional right to counsel to pursue a discretionary appeal, "he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely.") (footnote omitted); Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987) ("the right to appointed counsel extends to the first appeal of right, and no further," discussing Ross and Torna, other citations omitted); Jackson v. Johnson, 217 F.3d 360, 364-365 and nn. 21-23 (5th Cir. 2000) (discussing Ross and Torna, concluding "that a criminal defendant has no right to counsel on matters related to filing a motion for rehearing following the disposition of his case on direct appeal."). Defendant is not entitled to relief on this claim, asserted in ground one and repeated

---

[12] Halbert v. Michigan, __ S.Ct. __, 2005 WL 1469183, *3 (June 23, 2005); Evitts v. Lucey, 469 U.S. 387, 396-397, 105 S.Ct. 830, 836-837, 83 L.Ed.2d 821 (1985).

elsewhere in the § 2255 motion.  For all of these reasons, the claims raised in ground one are without merit.

**Ground Two**

In ground two, Defendant asserts that trial and appellate counsel were ineffective in failing to seek dismissal of the wire fraud counts of the indictment under 18 U.S.C. § 1343, because they failed to charge materiality as an element of the offenses.  Doc. 480, p. 5(1); Doc. 481, pp. 6-7; Doc. 552, pp. 14-17.  Defendant relies upon Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), United States v. Gaudin, 525 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), and Neder  v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).  Doc. 327, pp. 8-12; Doc. 481, pp. 6-7; Doc. 552, pp. 14-17.  Defendant argues that materiality is not alleged in the wire fraud counts or in the conspiracy count.  Doc. 481, p. 7; doc. 552, p. 14.  He also asserts that the allegations in the conspiracy count (in the "object," "manner and means," and "overt acts") relate to periods after decisions were made about the transactions, and so do not relate to or support the wire fraud.  Doc. 552, p. 15.  He asserts that an indictment must be specific and particular, and the Government's broad allegations of false and fraudulent misrepresentations are prohibited by Russell.  Id., pp. 15-16.

The petitioners in Russell were convicted of "refus[ing] to answer any question pertinent to the question under inquiry" when summoned by a congressional subcommittee.  369 U.S. at 752 and n. 2, 82 S.Ct. at 1040 and n. 2 (quoting 2 U.S.C. § 192).  Each indictment before the Court followed this language, but "failed to state the subject under investigation at the time of the subcommittee's interrogation of the

defendant." *Id.*, at 753, 82 S.Ct. at 1041 (footnote omitted).  For example, one of the petitioners who refused to answer "pertinent" questions was not told at the time what subject was under investigation by the subcommittee.  *Id.*, at 767-768, 82 S.Ct. at 1048-49.  The Court held that the failure to identify the subject matter of the inquiry caused the failure to apprise the accused of the nature of the accusation against him, requiring the accused "to go to trial with the chief issue undefined," and "enabl[ing] his conviction to rest on one point and the affirmance of the conviction to rest on another."  *Id.*, at 766, 82 S.Ct. at 1048.  The Court distinguished Markham v. United States, 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed.2d 441 (1895), which "holds only that a perjury indictment need not set forth how and why the statements were allegedly material."  *Id.*, at 771, n. 18, 82 S.Ct. at 1051, n. 18.

Gaudin involved a prosecution for making material false statements in a matter within the jurisdiction of a Government agency.  While the jury was instructed that the prosecution had to prove that the statements were material, it was also instructed that materiality was an issue for the court to decide *and* it was instructed that the statements alleged were material.  515 U.S. at 508, 115 S.Ct. at 2313.  The Court held that refusing to allow the jury to determine materiality violated the right to have a jury decide every element beyond a reasonable doubt.  *Id.*, at 522-523, 115 S.Ct. at 2320.  In that case, the Government did not argue that the error was harmless or that it was not plain error.  *Id.*, at 526, 115 S.Ct. at 2321 (C.J. Rehnquist, concurring).

In Neder, the Court held "that materiality is an element of the federal mail fraud, wire fraud, and bank fraud statutes" charged under 18 U.S.C. § § 1341, 1343, and 1344.  527 U.S. at 4-6, 119 S.Ct. at 1831-32.  Section 1343 proscribes use of interstate

or foreign wire facilities as part of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  By prohibiting a "scheme to defraud" the Government does not have to prove actual reliance or damages, but does have to prove the materiality of the misrepresentations.  527 U.S. at 25, 119 S.Ct. at 1841.  "[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  527 U.S. at 16, 119 S.Ct. at 1837 (citations omitted).

The Court held "that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes," and said:  "we remand this case to the Court of Appeals for it to consider in the first instance whether the jury-instruction error was harmless."  527 U.S. at 25, 119 S.Ct. at 1841.  On remand, the Eleventh Circuit found that the court's failure to properly instruct the jury on materiality was harmless error, and affirmed the convictions.  United States v. Neder, 197 F.3d 1122 (11th Cir. 1999).

> Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement.  Indeed, a false statement can be material even if the decision maker actually knew or should have known that the statement was false.

197 F.3d at 1128 (citations omitted).

The Eleventh Circuit rejected the argument that the Government had to prove that the evidence overwhelmingly supported the materiality of every charged falsehood. Id., at 1129.  Instead, the Government's burden on harmless error review was to "show that the evidence of materiality is so overwhelming for enough of the falsehoods

charged in a particular count that no rational jury, properly instructed on the element of materiality, could have acquitted [defendant] on that count." *Id.* (footnoted omitted).[13] The court accepted that the jury found the defendant's representations were falsehoods, and considered only whether they were material. *Id.*, at 1130.

Here, Defendant asserts not that the jury was improperly instructed as to materiality (which was the issue in <u>Neder</u>), but that the indictment was fatally defective for failing to charge materiality. Doc. 327, pp. 1-14; doc. 481, pp.6-9; doc. 552, pp. 4-17. The object of the conspiracy, as charged in count one, was to "obtain funds from victim investors by fraudulently misrepresenting the existence of high yield, low risk investments in the form of U.S. Treasuries leasing documents and BFLs [Block Fund Letters] or LCPOs [Letters of Credit Purchase Orders]." Doc. 2, p. 6. To do so, they represented (*inter alia*) that the investment funds were placed in escrow for safekeeping with Defendant Pope so the funds could be used for these investments. *Id.* "Typically, an indictment sets forth what the scheme was designed to deprive the victim 'of' and then describes by what means the scheme was designed to be accomplished." <u>United States v. Bobo</u>, 344 F.3d 1076, 1084 (11th Cir. 2003).

Counts 6, 7, 11, and 19 are the wire fraud counts under 18 U.S.C. § 1343 and § 2. Count six charged that from on or about January 1, 1995, and May 16, 1996, in this district and elsewhere, Defendants Pope, Kelly and Kaemmerling:

> knowingly and willfully devised a scheme to defraud and for obtaining money and property by means of false pretenses, representations and promises, well knowing at the time that the pretenses, representations and promises were false when made, *and which scheme and artifice so*

---

[13] The trial court in that case had decided materiality as a matter of law and, over objection, instructed the jury that it need not consider materiality. 197 F.3d at 1127-28.

*devised and intended to be devised by the defendants was in substance
as described in Count One of this indictment, which description is
expressly incorporated herein and made a part hereof as set forth herein.*

*A. On or about February 14, 1996, for the purpose of executing said
scheme and attempting to do so, in furtherance thereof, the defendants
did knowingly transport and caused to be transmitted by wire in interstate
commerce between Pensacola, Florida and Dothan, Alabama, a letter
from defendant POPE to C.J. Carpenter, a principal in DOIT, Inc., wherein
the defendants attempt to conceal the circumstances concerning the theft
of the money that had been invested by the principals of DOIT, Inc., with
the defendants.*

Doc. 2, pp. 40-41 (emphasis added). This wire transmission (by facsimile) is also

described in Count 1. *Id.*, p. 20. Counts 7 and 11 similarly charge that from January 1,

1995 and May 16, 1996, in this district and elsewhere, these three defendants were

involved in a scheme to defraud (incorporated from count one), and that for purposes of

executing the scheme a letter from Pope was transmitted by wire on a certain date.

Count 7 charges wire transmission of a letter on October 17, 1995, to an attorney for

Menac Associates Limited, in an attempt to conceal the circumstances of theft of

money which was invested with defendants by Menac. Doc. 2, pp. 41-42. This

facsimile transmission is also described in Count 1. *Id.*, p. 23. Count 11 alleges wire

transmission of a letter on December 11, 1995, to falsely represent that funds

deposited by Prestige Funding, Inc., were still on deposit with Defendant Pope when in

fact Defendant Pope had already withdrawn a portion of the funds. *Id.*, pp. 43-44. This

facsimile transmission is also described in Count 1. *Id.*, p. 28. Count 19 charges that

from January 1, 1995 and May 16, 1996, in this district and elsewhere, these three

defendants (and Defendant Harrison) were involved in a scheme to defraud as

incorporated from count one, and charges that on March 20, 1996, for the purpose of

executing the scheme defendants did knowingly transmit and attempted to transmit by wire $296,500 in stolen proceeds from Atlantic Cruise Ships, Inc.  Doc. 2, pp. 48-49. Defendant's attempt to make this wire transfer is also described in Count 1.  *Id.*, p. 37.

Regarding the wire fraud counts, the jury was instructed that it must find beyond a reasonable doubt that the defendant "knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," that he did so willfully with intent to defraud, and that he transmitted or caused transmission by wire of "some communication for the purpose of executing the scheme to defraud, as alleged in the applicable count of the indictment."  Doc. 123, p. 26.  They were instructed that "'scheme to defraud' includes any plan or course of action intended to deceive or cheat someone out of money or property by means of false or fraudulent pretenses, representations, or promises."  *Id.*

Of greatest importance, and distinguishing this case from <u>Neder</u>, the jury was further instructed:

> A statement or representation is "false" or "fraudulent" if it relates to a *material fact* and is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with intent to defraud.  A statement or representation may also be "false" or "fraudulent" when it constitutes a half truth, or effectively conceals a *material fact*, with intent to defraud.
>
> A "material fact" is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction.

Doc. 123, pp. 26-27 (emphasis added).

According to Defendant's argument, the indictment should have charged that, for example, statements that were made to conceal the theft of money invested with defendants *were also material*.  This is unpersuasive.  It was plainly alleged that this

was a scheme to defraud investors of money they had invested with defendants.  The
false or misleading statements concealed the fact that the promises made as to the
investments were not kept.  It is hard to imagine how such statements could be
immaterial.  The materiality is apparent, as the requirement of materiality was apparent
from the statute (which does not mention materiality), based on the settled common law
meaning of fraud as requiring a material misrepresentation.  Neder, 527 U.S. at 22, 119
S.Ct. at 1840.  The jury decided the issue of materiality based upon adequate
instructions.

        In Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974),
petitioners were charged with 21 counts of using the mails to carry an obscene book
and obscene advertisement, and conspiracy to do so, in violation of 18 U.S.C. § § 2,
371, and 1461.  Id., at 91, 94 S.Ct. at 2894.  Obscenity was an element to be proven to
the jury.  Cf. 418 U.S. at 99, 94 S.Ct. at 2898 (setting forth the "three elements [which]
must coalesce" to meet the definition of obscenity under which defendants were tried,
citations omitted); 418 U.S. at 100, 94 S.Ct. at 2899 (finding the evidence supported
jury determination that brochure was obscene).  Petitioners challenged the sufficiency
of the indictment for charging only the statutory language, which was argued to be
unconstitutionally vague, and for failing to give them adequate notice of the charges.
Id., at 117, 94 S.Ct. at 2907.  The Court said:

        Our prior cases indicate that an indictment is sufficient if it, first, contains
        the elements of the offense charged and fairly informs the defendant of
        the charge against which he must defend, and, second, enables him to
        plead an acquittal or conviction in bar of future prosecutions for the same
        offense.  It is generally sufficient that an indictment set forth the offense in
        the words of the statute itself, as long as "those words of themselves fully,
        directly, and expressly, without any uncertainty or ambiguity, set forth all

the elements necessary to constitute the offence intended to be
punished."

*Id.* (citations omitted); *see also* <u>United States v. Woodruff</u>, 296 F.3d 1041, 1046, 1047

(11th Cir. 2002), *cert. denied,* 537 U.S. 1114 (2003) (quoting portions of this language).

The <u>Hamling</u> Court found that <u>Russell</u> did not render the indictment insufficient.

*Id.*, at 118, 94 S.Ct. at 2908.  Contrasting <u>Russell</u>, where the subject of the committee's

inquiry was central to every prosecution under the statute:

> The definition of obscenity, however, is not a question of fact, but one of
> law; the word "obscene," as used in 18 U.S.C. § 1461, is not merely a
> generic or descriptive term, but a legal term of art.  The legal definition of
> obscenity does not change with each indictment; it is a term sufficiently
> definite in legal meaning to give a defendant notice of the charge against
> him.  Since the various component parts of the constitutional definition of
> obscenity need not be alleged in the indictment in order to establish its
> sufficiency, the indictment in this case was sufficient to adequately inform
> petitioners of the charges against them.

*Id.*, at 118-119, 94 S.Ct. at 2908 (citations and footnote omitted).

Similarly, an indictment is not defective for failing to allege mens rea, if the

allegation of the requisite state of mind can be inferred from other allegations of the

indictment.  <u>Woodruff</u>, 296 F.3d at 1046-47; <u>United States v. Gray</u>, 260 F.3d 1267,

1282 (11th Cir. 2001), *cert. denied*, 536 U.S. 963 (2002).[14]  "[P]ractical, rather than

technical, considerations govern the validity of an indictment," and "[m]inor deficiencies

that do not prejudice the defendant" do not result in reversal of a conviction.  <u>Gray</u>, 260

F.3d at 1283, *quoting*, <u>United States v. Adams</u>, 83 F.3d 1371, 1375 (11th Cir.), *cert.*

*denied*, 519 U.S. 973 (1996) (other citation omitted).  In <u>Adams</u>, a case originating in

---

[14] Although in <u>Gray</u> the objection was raised for the first time on appeal, the court
in <u>Woodruff</u> found no reason its holding should be limited to unpreserved claims.  296
F.3d at 1047.

this district, the defendant argued that his kidnaping indictment was insufficient for

failing to charge that he held the person "for ransom or reward or otherwise."  83 F.3d

at 1372, *quoting* 18 U.S.C. § 1801.

> [Defendant] insists that his indictment contains no [intent] language that
> would serve as a substitute for "ransom or reward or otherwise," and thus
> an essential element of the offense is missing from it.  However, [the case
> cited] deals not with the sufficiency of an indictment, but instead with the
> sufficiency of the government's proof after trial.  An indictment, on the
> other hand, is sufficiently detailed if it: (1) contains the essential facts
> underlying each element of the offense, such that the defendant is
> properly informed of the proof he must meet, and (2) is specific enough to
> permit the defendant to use it to protect himself from a subsequent
> prosecution for the same offense.  [Russell].  It cannot be disputed that
> the indictment in this case, given its degree of factual temporal specificity,
> meets the second of these two criteria.
>
> We also readily reject Adams' claim based on the first *Russell* criterion.
> The factual specificity of the indictment more than adequately made him
> aware of the proof against him and the allegations to which he must
> answer.  The incident at issue is clearly defined, down to the date of the
> alleged offense.  The only arguable deficiency in the indictment is a failure
> to explicitly charge willfulness.

*Id.*, at 1374 (full citation to Russell omitted).  The court could "readily conclude" that

there had been no prejudice.  *Id.*, at 1375 (also noting that, in addition to factual

specificity, the indictment referenced the statute) (citations omitted).

For these reasons, Defendant's challenges to the indictment in ground two,

considered directly or in the context of counsel's ineffectiveness at trial or on appeal,

are without merit.

**Ground Three**

In ground three, Defendant asserts that trial and appellate counsel were

ineffective for failing to seek dismissal of the conspiracy charge, count one of the

indictment.  *Id.*, p. 5(2).  He asserts that this count does not charge the predicate crime

of wire fraud and failed to charge materiality.  *Id.*  This claim should be rejected for reasons previously discussed.

**Other Claims of Ineffective Assistance of Trial Counsel**

Defendant raises many other instances of alleged ineffectiveness by his trial counsel, set forth separately ahead.  Defendant was represented by Thomas Goolsby and Sam Currin at trial.

**Ground Four**

In ground four, Defendant asserts that trial counsel failed to prepare for trial. Doc. 480, p. 5(2).[15]  Specifically, Defendant asserts that trial counsel failed to meet with him prior to the first day of trial, failed to conduct any investigation, and failed to review the indictment or the consequences of the charges with Defendant at any time.  *Id.* Defendant asserts that counsel failed to make any discovery requests of the Government, did not examine discovery produced by the Government, and did not review Government exhibits with Defendant or discuss potential defense exhibits with Defendant.  *Id.*, p. 5(3).  He asserts that counsel failed to review his books, records, and files, and failed to seek exculpatory evidence from the Government.  *Id.*  Defendant asserts that counsel ignored Defendant's attempts to communicate with him, ignored Defendant's suggestions of possible witnesses, and did not communicate with

---

[15] In grounds four, five, six, and seven, Defendant also asserts that appellate counsel instructed him that trial counsel's ineffectiveness could not be raised on direct appeal.  Doc. 480, pp. 5(2), 5(4), 5(7), and 5(8).  It is not clear whether he raises this as a separate claim against appellate counsel, or to avoid potential default for not raising the claim on appeal.  Counsel's advice was not incorrect and Defendant did not default his trial counsel ineffectiveness claims by not raising them on appeal.  Consequently, there is therefore no prejudice to the outcome even assuming this was the rare case where ineffectiveness could have been raised on appeal.  Edwards and Massaro, cited *supra*.

Government witnesses or discuss them with Defendant.  *Id.*  Defendant references

Exhibit A, a list of "potential witnesses" he gave to counsel, though what those

witnesses would have testified to is not set forth on the list.

Defendant asserts that counsel "failed to discuss potential issues related to

conflicts of interest between the jointly represented co-defendants, and then, during the

Garcia hearing, counsel led the court to believe that counsel had" discussed those

issues.  *Id.*  Defendant asserts that counsel failed to retain an expert (or discuss that

possibility with Defendant) to give expert testimony for the defense, failed to file any

pretrial motions except one which was prepared exclusively by Defendant; and ignored

Defendant's research.  Doc. 480, pp. 5(2) - 5(4).

Many of these allegations are contradicted by the affidavit of Thomas Goolsby.

Doc. 534, Ex. 4.  Goolsby states that he and his partner, Sam Currin, represented

Kaemmerling, Kelly and Pope for several years prior to the trial in this case, beginning

when the case was originally investigated in California.  *Id.*, p. 1.  Goolsby said he and

Currin met with the three Defendant's "on numerous occasions, had numerous

telephone conversations and exchanged mail and fax correspondence."  *Id.*  Goolsby

states that because the investigation went on for years, they had dealt with the case

"over many, many months and spent countless hours reading contracts, reports and

other documents pertaining to the case."  *Id.*

Goolsby avers that he called useful witnesses, and met with Defendants daily

during trial.  Ex. 4, p. 2.  He states that no conflicts existed in the joint representation,

and that the district judge held a hearing on that issue.  *Id.*  Goolsby did not seek a bill

of particulars because there were no grounds for it, and it would not have served any

purpose if it had been granted.  *Id.*  He states that many boxes of discovery were produced by the Government and Defendant reviewed the discovery with counsel.  *Id.*

Defendant replies that the points made in Goolsby's "very general affidavit" are disputed by his § 2255 motion and affidavit.  Doc. 550, p. 3.  The suggestion is that an evidentiary hearing is needed because there are disputes of fact.

An evidentiary hearing is not warranted.  Plaintiff's allegations are insufficient to show ineffective assistance of counsel because prejudice to the outcome has not been shown.  "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).  A defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel.  *See* Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir. 1990), *cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d Cir. 1990), *cert. denied*, 502 U.S. 826 (1991).  A bare claim of "failure to investigate" is facially insufficient because it fails to allege the evidence which trial counsel failed to uncover, and thus, *ipso facto*, demonstrates neither attorney error nor prejudice to the outcome.

As to the claim of conflict of interest, the Government filed a motion to disqualify attorneys, indicating that counsel had discussed possible conflicts with Goolsby and believed a hearing was required under United States v. Garcia, 517 F.2d 272 (5th Cir.

1975).  Doc. 60.  A <u>Garcia</u> hearing was held on July 12, 2000.  Doc. 76 (minutes); doc. 497 (transcript).

At the hearing, the court asked Goolsby if he had discussed with his clients "the many potential problems that may arise" in the joint representation.  Doc. 497, p. 3.[16] Goolsby responded:

> I have, Your Honor.  And I have been dealing with these matters, these facts since about 1995 or '96 with these defendants.  And we have never run into a problem with any kind of conflict, and I don't foresee one at this time.  And I have gone over it at length with my clients.

*Id.*  He indicated his understanding that it committed the three defendants to an "all or nothing," "sink or swim together," kind of defense.  *Id.*

The court asked Goolsby if he had discussed with defendants the fact that his investigation might not have been as thorough as if they each had independent counsel, and that joint representation might inhibit or prevent plea negotiations.  *Id.*, pp. 3-4.  Goolsby said that was addressed in this case and the investigation in California, and throughout this course of time.  *Id.*, p. 4.  He said they had discussed that it might present insurmountable problems if there was a grant of immunity in exchange for testimony, and the possibility of conflict if he could not communicate to one defendant something said by another.  *Id.*  He said that they discussed the possible effect on the waiver of a jury trial, challenges at jury selection, and challenges to evidence that might benefit one defendant and harm another defendant.  *Id.*, p. 5.  He said "[w]e have gone over the evidence at length.  My clients produced voluminous amounts of paperwork for the grand jury, which I have previously dealt with in a prior case in California."  *Id.*  He

---

[16] The Government also quotes at length from this transcript.  Doc. 534, pp. 16-17.

Case Nos. 3:00cr45-RV and 3:03cv337-RV/WCS

said so far they had not discovered evidence which would help one but hurt another

defendant.  *Id.*  Goolsby advised that they had discussed the possibility that his joint

representation might affect his advice about whether one of them should testify, and his

cross examination of a Government witness.  *Id.*, pp. 5-6.  He had discussed with

defendants that a typical defense in conspiracy is to pass the blame on to another, but

he could not pass it on to another defendant he represented.  *Id.*, p. 6.  He also advised

them regarding relative culpability and sentencing issues.  *Id.*, pp. 6-7.

The court gave each of the three defendants a waiver form, and gave them time

to review it.  *Id.*, p. 7.  Defendant Pope was advised by the court:

> [T]he conspiracy charge in this case is sort of an unusual charge in that
> the government simply has to prove, first of all, that a – an agreement
> existed between two or more people to do something either forbidden by
> the law or otherwise they are ignoring what the law requires, and that the
> particular defendant involved, at least on one occasion, and in some way,
> shape or form, knowingly and willfully became a member of that
> conspiracy.

> *                    *                    *

> It [the conspiracy] requires proof of an overt act, I think, and – and that
> such overt act was knowingly committed at or about the time alleged in an
> effort to carry out or accomplish some object of the conspiracy.  Those
> four elements are really not all that difficult to establish by the government
> in the great majority of conspiracy cases brought. . . .

> *                    *                    *

> All of this is to simply say that you fully understand what this case is
> about.

*Id.*, pp. 7-8.  Defendant indicated to the court that he understood.  *Id.*, p. 8.  Asked by

the court if he had "discussed the conflict of interest matter thoroughly with your

attorney," Defendant responded "[y]es, sir, I have."  *Id.*

The court addressed all three defendants at length, and advised of their personal right to be represented by their own individual counsel. *Id.*, p. 12.  He advised that each should be careful to take advantage of the right to defend himself and minimize the possibility of conviction. *Id.*, p. 13.  They were advised that if their interests conflicted, the lawyer might have to help one defendant at the expense of another, or fail to do something he would normally do because of another defendant. *Id.*  They each indicated it was their desire to proceed with the same counsel, but "the effect of that may be to deprive you of the best opportunity you have to defend yourself." *Id.*, p. 14.

The court reiterated that Goolsby had said he had advised them of the possible problems with a conflict of interest, and did not mean to question the judgment, "but I do want to advise you on the record to think carefully and long and hard about this matter and to realize that there are some things that simply cannot be anticipated at this point in time." *Id.*  Defendants were advised that if it was a question of economics, if a defendant could not afford an independent attorney then one would be appointed, or counsel could be appointed temporarily to advise them on this matter. *Id.*, pp. 14-15. They were advised that they each had to make the decision for himself, and "to think very carefully and with full consideration of all the possible long-term impact that it might have[] as you make this decision." *Id.*, p. 15.

Defendant indicated he had no questions, that his decision was to retain Goolsby and his firm even though he represented two co-defendants, recognizing that conflicts could arise. *Id.*, pp. 16-19.  Defendant signed the waiver form. *Id.*, p. 18.  The signed waiver, which also sets forth potential problems which can result from joint representation, is doc. 80.

Case Nos. 3:00cr45-RV and 3:03cv337-RV/WCS

Counsel sought a continuance, agreeing that while he had been involved in this matter for an extended period of time, there were some different scenarios and his clients were spread over the country.  Doc. 497, p. 20.  He said "of course, we are working together using e-mail and faxes and telephone conferences and all," and they had some motions being prepared.  *Id.*, p. 21.

The court complied with Fed.R.Crim.P. 44(c) and United States v. Garcia, 517 F.2d 272, 278 (5th Cir. 1975), requiring that:

> [T]he district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest.  The defendant must be at liberty to question the district court as to the nature and consequences of his representation.  Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, and that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

Even where a court fails to comply with Rule 44(c) and Garcia, however, and the claim is raised on direct appeal, reversal is not warranted absent an actual conflict of interest.  United States v. Mers, 701 F.2d 1321, 1326-28 (11th Cir.), *cert denied*, 464 U.S. 991 (1983) (collecting cases).  In Mers the court found no conflict of interest where counsel represented four codefendants, two asserting entrapment and two asserting they had no knowledge of any conspiracy.  *Id.*, at 1328-29.  "The defenses in this case were not antagonistic, much less mutually exclusive," and defendants did not show "that they stood 'to gain significantly' by abandoning the common defense."  *Id.*, at 1329 (citation omitted).  Where co-defendants are "closely aligned" and the defenses are not antagonistic, a united defense may be the best strategy available.  *Id.* (citation omitted).

"To argue that because, stylistically or psychologically, another attorney might have

been more persuasive underestimates the jury's ability to evaluate the credibility of

evidence." *Id.*, at 1330.  Further, "[f]ailing to adopt a strategy of shifting blame may well

give rise to an actual conflict of interest, but to do so the strategy must have been an

option realistically available to trial counsel." *Id.*, at 1331.

Here, too, the defenses were not antagonistic or conflicting.  Counsel argued in

closing that what the Government had shown was not a crime, using the analogy of

putting a deposit down on a car or house:  if the deal does not go through it is not theft

when the deposit is not returned.  Doc. 287, pp. 30-33.  He argued that Pope earned

his escrow fees, and distributed money which was earned following default on the

contracts.  *Id.*, pp. 33, 37, 38-39, 41.  He argued that when a letter was sent with

concerns about funds, Defendant as escrow agent interpled the funds.  *Id.*, p. 34.  He

argued that Pope did not break laws, commit fraud, or launder money: "All he did was

act under the terms of the escrow agreement, as he was required in each of those

cases, taking orders in writing, and fulfilling those as an attorney is supposed to." *Id.*, p.

42.  He argued that Kelly and Kaemmerling wanted the deals to work, so everyone

would be happy and they would make a lot of money.  *Id.*, pp. 42-43, 44.

During closing argument, Counsel stressed that summary judgment had been

granted in favor of Defendants "on the exact deal that they are being dragged here into

federal criminal court for."  Doc. 287, p. 35.  Counsel argued, "if it's too complicated to

even understand, then the government has not in any way met its burden of proof

beyond a reasonable doubt, and that is evidence that is so convincing that you would

rely and act on it without hesitation in the most important matters in your life." *Id.*, pp. 45-46.

"In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).  " '[A]n actual conflict of interest' [means] precisely a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 1243 and 1245,152 L.Ed.2d 291 (2002) (emphasis by the Court).

Defendant has not an shown an actual conflict of interest.  He has not shown that the joint representation adversely affected his counsel's performance.

Moreover, Defendant's claim that counsel was not forthright with the court and did not explain or discuss any potential conflicts with him is contrary to his assurances to the court at the Garcia hearing and his signed waiver of the conflict.  "Solemn declarations in open court carry a strong presumption of verity," and Defendant's "subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Blackledge v. Allison, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) (citations omitted); see also United States v. Medlock, 12 F.3d 185, 187 (11th Cir. 1994) (strong presumption that statements to the court during plea colloquy are true).  Thus, even if Defendant had shown an actual conflict of interest, he waived

it.[17]  For all of these reasons, Defendant is not entitled to relief on ground four, asserting

ineffectiveness and conflict of counsel.

**Ground Five**

Defendant raises a number of separate claims of ineffectiveness of counsel

within ground five.  He asserts that trial counsel failed to consult with him or discuss

procedures and strategy, and never met with him before trial.  *Id.*, p. 5(4).  Defendant

asserts that counsel completely failed to prepare for jury selection, and gave the name

Jim Wells (discussed ahead) to the judge to mention to potential jurors but only at

Defendant's insistence.  *Id.*  Defendant asserts that counsel failed to give an opening

statement, claiming it was "tactical" and reserving it until after the Government rested,

but it was actually because the attorneys "were woefully unprepared to try the case."

*Id.*  Defendant asserts that counsel failed to include "obvious arguments" in opening

statement, examination of witnesses, or closing statement, though Defendant gave

counsel an outline of arguments, attached as Ex. B.  *Id.*

As noted above, general claims of inadequacy do not establish ineffectiveness of

counsel absent resulting prejudice to the outcome.  Prejudice here has not been

specifically alleged or demonstrated.

Defendant asserts that counsel should have separated him from the other

defendants by emphasizing his small role and extremely small monetary interest in the

transactions.  *Id.*, p. 5(5).  As set forth previously, counsel stressed in closing argument

---

[17] Defendant continues to argue conflict of interest in other grounds ahead.  The
Garcia hearing waiver applies to *any* claims of conflict of interest allegedly arising from
the joint representation of the defendants.  Nonetheless, each instance of alleged
conflict will be addressed as it arises in the pages ahead.

that Defendant acted only as an escrow agent for which he collected only modest fees. It was brought out through testimony that Defendant only acted as, and was compensated as, an escrow attorney. *See* doc. 283, p. 74; doc. 284, p. 125. Defendant himself testified that he acted pursuant to the escrow agreements and was compensated as an escrow agent. Doc. 284, pp. 236-237, 239-241, 256-257, 257-258, 260-261, 264-265, 280-281, 286-287, 303; doc. 285, pp. 12, 18, 49, 55, 65, 76, 92-93, 136-137, 176-177,178. Defendant also testified, however, that he received two unsolicited payments of $10,000. Doc 285, p. 236. Defendant agreed that he received over $27,000 in fees, but said there was a great deal of work and stress associated with "the whole thing."

Defendant also asserts that counsel "implemented a strategy that could only bore and ostracize the jury," by going through the Government's voluminous documents page by page, and "[s]uch foolish strategy could do nothing but alienate a jury, in this case producing a quick verdict of guilty on all counts against all defendants." *Id.* Defendant has not, however, explained how a different strategy had any better likelihood of success and again, has not demonstrated prejudice to the outcome. Given the defense that Defendant only acted in compliance with written agreements entered into by the alleged victims, the best way to demonstrate this was to go through the documents with Defendant in front of the jury, so that he could explain his legal understanding of his duties and responsibilities, and how he attempted to comply.

Defendant asserts that counsel did not consult with him about the Government's witnesses or possible areas for cross examination. *Id.* He asserts counsel failed to meet with him at breaks, after hours, or weekends during the trial. *Id.* Defendant faults

counsel for producing only two exhibits compared to the hundreds of Government exhibits, though Defendant provided counsel with a compilation of potential exhibits.  *Id.* He claims that counsel did not interview or call any witnesses aside from the defendants, though a list of potential witnesses was supplied.  *Id.*, pp. 5(5)-5(6). Defendant asserts that counsel did not communicate with him about any witnesses except with regard to a hearing on a pretrial motion to dismiss.  *Id.*, p. 5(6).  Defendant asserts that counsel should have presented as character witnesses the people who submitted letters at the time of sentencing.  *Id.* and Ex. C.  Defendant asserts that he was "highly prejudiced" by counsel's failure to introduce "outstanding character testimony that was readily available."  Doc. 550, p. 11.

        Except for Wells and the character witnesses, Defendant has not supplied the anticipated testimony of witnesses he claims counsel should have called, and this claim is insufficient to establish error or prejudice as discussed above.  Regarding character witnesses, Defendant has not shown that counsel erred in failing to submit testimony of his good character at trial, or that it would have helped his defense.  *See* <u>Strickland</u>, 466 U.S. at 699-700, 104 S.Ct. at 2070-71 (decision not to submit evidence at sentencing, that people who knew defendant thought he was generally a good person, was a reasonable strategy and there was no prejudice to the outcome; the evidence might even have been harmful as contrary character evidence and criminal history could have come in); <u>United States v. Logan</u>, 717 F.2d 84, 88 (3d Cir. 1983) (good character evidence opens the door to contrary evidence);[18] <u>United States v. Best</u>, 219

_____

        [18] As stated there,

        By introducing evidence of his good character, the defendant "throw[s]

F.3d 192, 202 (2d Cir. 2000) (calling reputation witnesses in defense would have "opened the door" for an attack on character; "the decision whether to expose a defendant to such an attack is surely a tactical decision that cannot be second-guessed.").  The fact that Defendant was well-respected was not contrary to his participation in the offense, as the victims relied in part on his good reputation.  Doc. 278, pp. 141-144; doc. 279, p. 219.  *See also* Doc. 289 (sentencing transcript), pp. 47-(finding abuse of trust enhancement supported, the evidence was overwhelming that the victims were comforted in knowing that Defendant, an attorney, was acting as escrow agent).[19]  It is not at all clear that additional character evidence would have assisted Defendant.[20]  Defendant has not demonstrated attorney error or prejudice to the outcome.

---

open the entire subject" of his character and, consequently, allows the prosecutor to penetrate a previously proscribed preserve, to produce contradictory evidence, to cross-examine the defendant's character witnesses and to probe the extent and source of their opinions.  *Michelson v. United States*, 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948).  In other words, the defendant makes himself "vulnerable where the law otherwise shields him."  *Id. See also* Fed.R.Evid. 404, 608(a) and 803(21).

717 F.2d at 88.

[19] *See also Id.*, pp. 34, 36 (asserting that Defendant Pope was the "lynchpin," because without him the fraud probably could not have gone forward).

[20] As argued by the Government in response to character letters written on Kaemmerling's behalf, if he held himself out to be a Christian and an example to others then what he did was all the more terrible.  *Id.*, pp. 58-64.  Reviewing the letters written on behalf of this Defendant, the Government noted that Defendant was a Christian, and "in all respects was a very admired person," but along the way he made an intentional choice.  *Id.*, pp. 92-97.

Defendant claims that counsel should have used Defendant's "prior results in civil actions and Florida bar investigation to his benefit," as counsel ignored these facts and the Government used them against Defendant.  Doc. 480, p. 5(6).  These assertions are not supported by the record.  It was noted many times during trial that summary judgment was granted in Defendants' favor as to the Prestige funds.  Doc. 284, pp. 68, 82-83, 127-128.  Defendant testified that the Chicago judge had found the Prestige contract properly defaulted, and that the money was deemed earned, and read the order to the jury.  Doc. 284, pp. 309-311, 317-320; doc. 285, pp. 6-7.  Defendant testified that the Chicago judge's interpretation of the contract in that suit was the same as his, and so he felt he was interpreting the contracts correctly in finding default.  Doc. 285, pp. 37-39.  As set forth earlier, counsel stressed that the civil action was resolved in favor of defendants a number of times during his closing argument.  The court was reminded of the Chicago lawsuit at sentencing.  Doc. 289, pp. 7, 10-12, 43, 47.

Defendant testified at trial that "[T]he Florida Bar has reviewed all my records," and did not find problems.  *Id.*, pp. 230, 231.  At sentencing, counsel also asked the court to take into consideration that The Florida Bar found Defendant had not acted improperly as an attorney.  Doc. 289, pp. 51-52.

Defendant faults counsel for failing to object to admission of any of the Government's documents.  *Id.*  He asserts that documentation of the Prestige transaction "was allowed into evidence without the government calling a single witness to authenticate and prove up the exhibits for introduction."  *Id.*  Defendant alleges that this was the only evidence of these transactions, and this evidence prevented dismissal of the counts and adversely impacted his sentence.  *Id.*

Counsel Goolsby did make an objection.  The records regarding Prestige were introduced through the testimony of FBI Agent Dill, and the Government said there were no witnesses other than the stipulated documents.  Doc. 282, pp. 94-95.  Goolsby objected and argued (at the bench) that they agreed to the authenticity of documents, "but in no way did we pass up on anything about materiality or relevancy or anything with the government attempting to establish the case against us based only on documents and no testimony."  *Id.*, pp. 97-98.  The court overruled the objection, but said motions could be renewed later.  *Id.*, p. 99.  After the Government rested Goolsby made a motion for judgment of acquittal which was denied.  *Id.*, pp. 167-177.  He argued that, in good faith, they agreed to the Prestige documents assuming there would be witnesses.  *Id.*, p. 175.  The court thought that would be a good argument except there was a lot of evidence, showing a comparable pattern of activity.  *Id.*, p. 177.

Defendant has not shown that the stipulation to authenticity was erroneous, or that there was another objection available to counsel which could have changed the outcome.  It is sound trial strategy to stipulate to authenticity so as not to be blamed by the jury for making them go through boring testimony as to authenticity.  Further, Defendant has made no allegations that any of the documents could have been kept out of evidence for lack of authenticity.  Thus, ineffective assistance of counsel as to this has not been shown.

Counsel is faulted for failing to prepare Defendant to testify.  *Id.*  Defendant alleges that counsel met with him and the other two defendants for only 10 or 15 minutes during a lunch break, and "informed them all that testimony would simply be a review of the government exhibits and rejected comments about offending the jury."

*Id.*, pp. 5(6)-5(7).  Defendant does not allege how his testimony would have been

different or more beneficial to the defense had counsel spent more time preparing him

for it.  Further, as noted by the Government, Defendant had the benefit of sitting

through the testimony and cross examination of his codefendants before he testified.

Doc. 534, p. 21.  He has not established error of counsel or prejudice to the outcome.

Defendant claims that Goolsby and Currin developed conflicts with Kaemmerling

and Kelly in the weeks before trial.  *Id.*, p. 5(7).  Defendant alleges that Goolsby used

profanity and threatened codefendants that he would only "go through the motions."  *Id.*

Defendant asserts that pretrial discussions were almost exclusively about money, and

that by the time of trial, counsel and his codefendants were not speaking to each other.

*Id.*

Defendant references Ex. D, the third page of a three page letter to counsel from

Defendant dated July 27, 2000, and copied to Kaemmerling and Kelly.  Counsel's

response (handwritten on that page), reads, in its entirety:

> Ray – Perhaps you gentlemen may desire to seek other legal counsel.  I
> have never before been referred to as "timid."  I could care less what
> happens to Ben Beard or anyone else in his office.  My only concern was
> with the impact of a "[scorched] earth" policy on our case – if we did not
> prevail on the motion.  I have more than a little experience in this area &
> will not tolerate anyone <u>second guessing</u> my decisions or <u>directing me to
> file a motion</u>.  Have you gotten <u>even one statement</u> from any individual
> who will come to court to testify as to Beard's involvement?  Until we have
> as [sic] least a good faith basis as to his <u>improper participation</u>, we will **not**
> file any motion.  Never forget who stopped the prosecution of this matter
> in California.  At your behest, I will notify the court of my withdrawal from
> these cases.

Doc. 480, Ex. D (emphasis in original).[21]  Defendant asserts that counsel never formally

withdrew until after sentencing, and that he was harmed by this conflict.

Defendant does not include his own letter to counsel in its entirety.  The

Government construes Defendant's allegation to be "that he now would have preferred

a 'slash and burn' 'take no prisoners' defense wherein every obstructionist tactic was to

be employed, a policy which he had espoused prior to trial but which his counsel

determined to be counterproductive."  Doc. 534, p. 19.

Counsel's indication that he would withdraw at the behest of defendants is read

in the context of his response, that he was concerned with the impact of a motion if they

did not prevail, and he would not file a motion challenging Assistant United States

Attorney Beard's participation absent at least a good faith basis in support.  Defendant

has not shown that counsel's opinions were based on anything other than the reasons

stated, which are sound.  The failure to file an unsupported motion is reasonable and

does not prejudice the outcome.  Ground five in its entirety is without merit.

**Ground Six**

Defendant asserts in ground six that Goolsby and Currin were ineffective after

the trial and at sentencing.  *Id.*, p. 5(7).  Specifically, Defendant asserts that counsel

failed to file a motion for new trial based on lack of proof at trial, deficiencies in the

indictment, and counsel's ineffectiveness.  *Id.*  He asserts that counsel failed to explain

how sentences were calculated or the range of possible sentences, and never advised

of the possibility of a downward departure.  *Id.*, pp. 5(7)-5(8).  Defendant asserts that

---

[21] The court added bold type to the word "not" which, in the handwritten copy, is
underlined twice.

counsel did not communicate with him after trial, and he had no instructions from counsel before meeting, alone, with the officer preparing the PSR.  *Id.*, p. 5(8). Defendant claims that new counsel was retained due to the "complete lack of effort and developing animosity between them [Goolsby and Currin] and co-defendants," and that original trial counsel attended but did nothing at sentencing.  *Id.*

The indictment claims were addressed *supra*, and the insufficiency of the evidence claim is addressed *infra*.  Neither have merit.  Defendant does not identify how he was prejudiced by the lack of instruction or presence of counsel when he was interviewed for the PSR, or what objections should have been raised at sentencing.  He refers to a lack of effort and animosity between the attorneys and other defendants, but not with himself.  He does not identify anything counsel failed to do on his (or any other defendant's) behalf as a result.  Defendant is not entitled to relief on this claim.

**Ground Seven**

Defendant faults counsel for failing to communicate with or call potential defense witnesses.  Doc. 480, p. 5(8).  He identifies James Wells, auditor for The Florida Bar, as a witness who should have been called.  *Id.*  Defendant himself had a subpoena served on Wells.  *Id.* and Ex. F.  Defendant asserts that Wells had intimate knowledge of Defendant's books, records, and practices, that he would have testified that Defendant "did not overly profit from the alleged frauds that Movant may have been taken advantage of, but that nothing indicated a participation in any fraud of conspiracy."  *Id.*, p. 5(9).  He claims that Wells would have also testified about Defendant's good character.  *Id.*

Defendant has submitted the affidavit of Wells.  Doc. 480, Ex. G.  Wells states

that he is a CPA and full time employee of The Florida Bar as an auditor of lawyer trust

accounts.  Wells was instructed to audit Defendant's trust account records on July 30,

1997.  His audit did not disclose that Defendant profited personally from the

"investment transactions that were the focus of the complaint filed against Mr. Pope."

His audit did not disclose that Defendant intended to defraud investors, but that he:

> acted at the direction of account managers.  Wells states that he had a high
> opinion of Defendant and was surprised he was involved in questionable
> investment transactions, and believed Defendant must have been drawn in by
> these people using him for their benefit.  Wells states that he was subpoenaed
> by Defendant, but Defendant's counsel never talked to him and he was never
> called to testify.

Ex. G, p. 2.

The Government responds that the only knowledge Wells had of Defendant's

office procedures was through Defendant and therefore hearsay, and that Wells had no

knowledge about Defendant's misrepresentations to others.  Doc. 534, p. 22.  Wells

conducted a trust account audit of Defendant's books and records, not a criminal

investigation.  *Id.*  Goolsby states in his affidavit he had no recollection that Wells could

have given relevant, non-hearsay evidence.  *Id.*, Ex. 4.

Defendant has not shown that Wells could have offered admissible, beneficial

information.  Given the introduction and testimony regarding so many documents, it is

hard to see how Wells's testimony, based on his trust accounting audit of records, could

have helped.  *Cf.* United States v. Petrie, 302 F.3d 1280, 1287-88 (11th Cir. 2002), *cert.

denied*, 538 U.S. 971 (2003) (affirming denial of introduction of business records, which

defendant claimed would have supported his good faith defense to fraud, through office

secretary; "[w]hile she is able to testify as to how the documents are maintained, filed, and retrieved, she simply is not able to testify concerning the origination and compilation of the documents.").[22]

Further, there was already testimony regarding Defendant's records through the testimony of Tracy Nicolai, employed by Defendant for eight years as a part time bookkeeper.  On cross examination by Goolsby, she said that when she met Defendant he was her Sunday School teacher.  Doc. 278, p. 113.  She said Defendant had a general practice and he was concerned with accuracy.  Doc. 278, pp. 113-114.  She testified that he never had her shred anything, she never saw him shred anything, and that everything appeared to be "above board."  *Id.*, pp. 114-115.  She said that Defendant acted according to what people told him to do.  *Id.*, p. 115.  She never saw him lie or cheat or act dishonestly, she only saw a lawyer doing his job and acting honestly.  *Id.*, pp. 116-117.  When questioned by the Government, she admitted she did not understand the transactions and would not know whether they were criminal.  *Id.*, p. 127.

Presumably, if admissible, the testimony of Wells would have been similarly favorable but vague.  Wells would not have had personal knowledge of Defendant's

---

[22] <u>Petrie</u> similarly involved a scheme in which prospective borrowers would pay an up front fee, and on execution of a funding contract the fee would be placed in an escrow account pending conditions.  302 F.3d at 1283.  A key condition was obtaining a payment guarantee, in the form of a letter of credit from a financial institution, within a certain number of days.  *Id.*  "Obtaining the guarantee required some form of collateral, which, in every instance, the prospective borrower was not able to provide," resulting in default on the contract and forfeiture of the fee.  *Id.*  The defense in that case was good faith reliance on the advice of counsel.  *Id.*, at 1287 and n. 6.  Testimony that the contracts were legal (and had actually been found proper by a Bahamian court) was disallowed on grounds of relevance and jury confusion; the issue was the conduct of the parties and representations made to other people.  *Id.*, at 1285-87.

involvement in the transactions or, especially, of his representations to others.  Wells would not have personal knowledge of the nature of the investment scheme. Defendant has not demonstrated attorney error or prejudice to the outcome.

**Ground Eight**

Defendant asserts that counsel was ineffective on appeal for failing to assert a violation of Defendant's grand jury right based on prosecutorial misconduct in the grand jury proceedings.  *Id.*, p. 5(9).  Specifically, Defendant asserts a conflict of interest, violation of privacy rules, improper comments on evidence before the grand jury, and "other likely violations that would have been discovered if the trial court had reviewed the grand jury transcripts prior to ruling on the motion to dismiss submitted pre-trial, as required by federal law."  *Id.*, pp. 5(9) - 5(10).

Defendant asserts that he filed a motion and memorandum to disqualify Assistant United States Attorney Beard because Beard served on a grievance committee of The Florida Bar investigating Defendant.  *Id.*, p. 5(10), citing docs. 104 and 105.  Defendant asserts that testimony was taken and the court denied his motion, improperly believing that he had the burden of proof, and without reviewing the grand jury transcripts.  *Id.*, p. 5(10).  Defendant asserts that he advised his appellate counsel by email of a case (discussed ahead), which was "on point," before submission of the appellate briefs.  *Id.*  A copy of the email is Ex. H, and a copy of Defendant's letter to counsel after the initial brief was filed is Ex. I.

Defendant has submitted "several pages of grand jury transcripts" as Ex. J.  *Id.*,

p. 5(11).[23]  "Traits" of this grand jury, which Defendant asserts are "indicative of

proceedings subject to constitutional problems," are that the same issues and parties

had been investigated by a series of grand juries, which could lead to improper use of

evidence and influence; the indictment was returned shortly before the statute of

limitations expired, "leading to abuses caused by haste;" and another prosecutor

drafted the indictment in Beard's absence.  *Id.*, p. 5(11).  Defendant asserts that

appellate counsel should have requested the grand jury transcript and should have

sought remand for review of the transcript.  *Id.*

Defendant relies on <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 108

S.Ct.  (1998) and <u>Sigma International v. United States</u>, 244 F.3d 841, 853 (11th Cir.

2001).  Doc. 481, pp. 11-12.  Defendant concedes that <u>Sigma International</u> was

subsequently vacated, but that the Eleventh Circuit's comments in <u>Bank of Nova Scotia</u>

"still remain very persuasive, indeed."  *Id.*, p. 12.

Trial counsel (Goolsby) filed a motion to disqualify AUSA Beard and dismiss the

indictment, with a supporting memorandum.  Docs. 104 and 105.  He argued, on behalf

of Kelly, Kaemmerling, and Pope, that Beard served on a Grievance Committee of The

Florida Bar for a three year term ending in April, 1997.  Doc. 105, p. 1.  Two grievances

---

[23] Defendant's Ex. J includes a cover letter from Defendant referencing two
pages of grand jury testimony that "Beard's staff mis/abely [sic] included . . . in the
Romain testimony."  Ex. J, p. 1.  In those pages the jurors are talking with Beard, and
trying to reconcile the conflicting statements of Edwards and his secretary; Beard
agrees (with the comment of a juror) that someone is lying, or they could both be lying.
Ex. J, p. 2 (p. 41 of a transcript).  There is a page missing, but apparently the
comments pertained only to Edwards and his secretary.  *Id.*, pp. 2-3 (pp. 41 and 43 of
transcript).

were filed against Defendant Pope beginning in late 1995, and Beard participated in the

grievance proceedings and investigation.  *Id.*, pp. 1-2.  Assistant State Attorney Edgar

was appointed as investigating member on the Committee.  The Committee monitored

the federal investigation being conducted in Sacramento, California.  *Id.*, p. 2.  No

charges were brought in California related to the 1996 investigation, but The Florida Bar

proceeding continued.  *Id.*, p. 2  "Indications are that Beard continued to communicate

with the investigating member of the grievance committee even after the end of his term

on the grievance committee."  *Id.*  The committee process lasted some four years,

including a full audit, and at the final grievance hearing no probable cause was found

for the two formal grievances.  *Id.*

Despite Beard's limited involvement in the process and the ultimate findings of

the committee, Goolsby argued that Beard continued to actively participate in the

federal and grand jury investigation and represent the Government in the prosecution.

*Id.*, pp. 3-4.  It was argued that Beard had access to confidential and privileged

information through the grievance investigation and that he violated the Rules of

Professional Conduct by participating as a public officer in a matter (the grand jury

investigation) in which he "participated personally and substantially while in private

practice or nongovernmental employment," *i.e.*, the grievance committee.  *Id.*, pp. 4-6.

It was argued that this violated the constitutional right to indictment by a grand jury.  It

was argued that "the courts intensify any review of any improprieties or apparent

improprieties of those entrusted to direct and advise the Grand Jury.  Beard's clear

ethical violation destroys the work of the Grand Jury and has tainted the entire

proceeding."  *Id.*, pp. 7-8.  It was argued that the Grand Jury was tainted as soon as he

walked into the room, and the indictment was void even absent a showing of prejudice. *Id.*, pp. 9-11.

The Government responded to the motion to disqualify and dismiss, submitting affidavits of Beard, Russell Edgar, Edwin Walborsky, and Michael Dill.  Doc. 107 and Exs. 1-4.  Also attached to the response, "as composite exhibit 5, for in camera review, *is the complete record of testimony given before the grand jury*.  Upon review, the court will not find any reference of any substance to The Florida Bar or its investigation." Doc. 107, p. 5 (emphasis added).

Beard stated by affidavit that he was a member of the grievance committee from 1994 to March or April of 1997, and that the United States Attorney in this district accepted a referral regarding the fraud in this case from the FBI on June 17, 1996. Doc. 107, Ex. 1, p. 1.  The case was assigned to him days later.  *Id.*  He stated that, as far as he could ascertain, only three grand jury subpoenas, for bank records, were issued in the years 1996 through 1998.  *Id.*  Due to a lack of agents, no substantive reports were made to the grand jury on this case and there was no active investigation by the FBI or the grand jury until May of 1999.  *Id.*, pp. 1-3.  Beard he did not learn until later that Defendant had been interviewed by agents in 1996.  *Id.*, p. 2.  While on the grievance committee, Beard said he was not present for any substantive matters or discussion of Defendant, and Beard states that he "recused himself" as to any matter brought up for discussion.  *Id.*  Beard avers that he did not obtain information from the grand jury and provide it to the grievance committee or obtain information from the grievance committee and provide it to the grand jury.  *Id*.  He avers that he did not receive or review any complaint against Defendant, and was no longer on the

committee before any substantive report or vote was taken.  *Id.*  On August 20, 1999,

Goolsby sent him a copy of Defendant's response to a bar complaint dated February

18, 1999.  *Id.*, p. 3.  Beard states that "there is no connection whatsoever between the

conduct of the ethics complaint investigated by the First DCA Grievance Committee of

the Florida Bar and the conduct of the grand jury investigation which led to the

indictment of the above referenced individuals."  *Id.*  Russell Edgar and Edwin

Walborsky provided similar evidence.[24]

   The affidavit of Michael Dill indicates that he was an FBI agent assigned to this

investigation, and he avers that he never received any information from Beard

regarding The Florida Bar investigation.  Doc. 107, Ex. 4, p. 1.  He states that at the

time he presented results of his investigation to the grand jury he was not aware of

Beard's service on the grievance committee, and he obtained no information from the

committee or from Beard regarding the committee's investigation.  *Id.*  Dill states that he

received a copy of Defendant's response to the Bar complaint from Defendant's

attorney on about August 20, 1999.  *Id.*  Dill's testimony before the grand jury has also

been supplied by the Government.  Doc. 534, Ex. 6.

---

[24] Russell Edgar served on the committee in 1996 and 1997, and said that the
procedure was that a complaint would be referred to the chairman, for assignment to a
member who would investigate and issue a report which was voted on by the
committee.  Doc. 107, Ex. 2, p. 1.  Beard was not chairman or vice chairman in 1996.
*Id.*  Edgar and Edwin Walborsky were assigned to investigate the complaint filed
against Defendant in 1996.  *Id.*  During the course of their investigation Edgar contacted
Beard to request the status of the federal investigation, but did not recall that Beard
provided any substantive information.  *Id.*, p. 2.  Edgar and Walborsky presented the
final Bar Committee results after Beard left, and did not recall providing any information
of substance to Beard after Beard left the committee.  *Id.*  Walborsky's affidavit is
similar in substance.  Doc. 107, Ex. 3, pp. 1-2.

Before trial, a hearing was held on the motion to disqualify.  Doc. 276.  Beard and FBI Agent Dill testified at the hearing, as did Lois Lepp (counsel to the Bar Grievance Committees at the time and involved with Defendant's grievance).  *Id.* Goolsby made his arguments.  *Id.*, pp. 86-90, 97-98.  The motion was denied.  *Id.*, pp. 100-104.

On direct appeal, Defendants asserted prosecutorial misconduct due to Beard's service on the grievance committee during Pope's investigation by the grand jury, as well as allegedly improper comments made in closing argument.  Doc. 534, Ex. A (Government's answer brief on appeal), p. 60.  The Government argued that the district court specifically found, following a hearing, no evidence of conflict or grounds to disqualify.  *Id.*, p. 61.  "Even now, after the completion of trial, the defendants have been unable to point to any information, confidential or otherwise, that the prosecutor received from his service on the bar committee that was used in the defendants' prosecution."  *Id.*

The Eleventh Circuit found that defendants failed to show, at the hearing on their motion, "what, if any, confidential information [Beard] received from Pope in [Beard's] capacity as a member of the Florida Bar grievance committee."  Doc. 534, Ex. 2 (copy of doc. 318 in the file), p. 6.

In response to the § 2255 claim, the Government asserts that appellate counsel did raise prosecutorial misconduct, so the argument is really that the appellate argument was incomplete or inadequate.  Doc. 534, pp. 25-26.  Defendant clarifies in his reply (and in the alternative for summary judgment) that his "appellate attorney did not raise Mr. Beard's serious conflict of interest before the *grand jury* on appeal.  Note

must be made that all the courts considering the issue have agreed Mr. Beard had a conflict."  Doc. 550, p. 4.

The latter statement is not true.  The district judge in this case was "unable to identify anything that I can pinpoint as really creating any kind of a conflict, and particularly a conflict that would fall within the rules of professional conduct . . . ."  Doc. 276, p. 103.  The court said it would have reservations "*if* there is any possible conflict, but *I don't find any possible conflict* from the facts that have been relayed and set out in the record."  *Id.*, p. 104 (emphasis added).  The court found there was no evidence that anything from the grievance proceeding was presented to the grand jury.  *Id.*, p. 104. Citing Bank of Nova Scotia, the court found no prejudice because there was no showing that, even if anything had been presented, it "substantially influenced the grand jury's decision to indict or that there was grave doubt that the decision to indict was free from substantial influence of such decisions."  *Id.*, pp. 101-102.  *See* 487 U.S. at 256, 108 S.Ct. at 2374 (adopting this standard for nonconstitutional error).[25]  *See also* Marshall v. Jerrico, Inc., 446 U.S. 238, 248-250, 100 S.Ct. 1610, 1616-17, 64 L.Ed.2d 182 (1980) (strict neutrality requirements for officials performing judicial and quasi judicial functions do not apply to those acting as prosecutor or plaintiff) (citations omitted).[26]

---

[25] Where the structural protections of the grand jury have been compromised so as to render the proceedings fundamentally unfair, prejudice is presumed.  *Id.*, at 256-257, 108 S.Ct. at 2374-75 (citations omitted).  Such an error was "exemplified" in a case finding racial discrimination in the selection of grand jurors.  *Id.* (citations omitted).

[26] *Compare* Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 802, 107 S.Ct. 2124, 2135, 95 L.Ed.2d 740 (1987) (in exercise of supervisory power, the Court found error in appointing counsel for an interested party as the prosecutor in related contempt proceeding).

Defendant has not shown any likelihood of a different outcome if appellate counsel had specifically raised the conflict before the grand jury as opposed to the prosecution in general, or as affecting the validity of the indictment.  In <u>Bank of Nova Scotia</u>, the Court held that an indictment should not be dismissed for errors in the grand jury proceedings absent prejudice to the outcome.  487 U.S. at 254, 108 S.Ct. at 2373. The misconduct found by the district court in that case – manipulation of the grand jury investigation to gather evidence for civil audits, and various violations of the secrecy provisions of Fed.R.Crim.P. Rule 6(e) – "might be relevant to an allegation of a purpose or intent to abuse the grand jury process.  Here, however, it is plain that these alleged breaches could not have affected the charging decision." *Id.*, at 259-260, 108 S.Ct. at 2376.  The Court therefore had "no occasion to consider them further." *Id.*

Here there has never been a demonstration of improper conflict due to Beard's involvement in the grievance committee and grand jury investigation.  "Prosecutors need not be entirely 'neutral and detached,' " and "are necessarily permitted to be zealous in their enforcement of the law."  446 U.S. at 248-249, 100 S.Ct. at 1616 (citations omitted, also noting that a legislature may offer rewards for prosecutions in the public interest).  *See also* <u>Matter of Grand Jury Subpoena of Rochon</u>, 873 F.2d 170, 174-176 (7th Cir. 1989) (alleged conflict was between potentially conflicting professional rather than personal interests, prosecutor named in a civil suit only in his official capacity should not have been disqualified from involvement in grand jury investigation).[27]  There was no showing here of prejudice to warrant dismissal of the

---

[27] The court found no basis to assume the prosecutor would defy the obligation of secrecy under Fed.R.Crim.P. 6(e), "in the absence of any district court finding that an unlawful disclosure has occurred of of any evidence that one will occur, the district

indictment under <u>Bank of Nova Scotia</u>.  *See also* <u>United States v. Williams</u>, 504 U.S. 36, 54, and n. 8, 112 S.Ct. 1735, 1746 and n. 8, 118 L.Ed.2d 352 (1992) (inadequacy or insufficiency of evidence presented to the grand jury, even when recast as a complaint that the presentation of evidence was incomplete or misleading, does not support dismissal of an indictment) (citing <u>Bank of Nova Scotia</u>, other citations omitted). Consequently, there was no error or prejudice in appellate counsel's failure to advance or stress this particular argument on appeal.

**Ground Nine**

Defendant asserts that appellate counsel was ineffective for failing to raise a due process claim based on insufficiency of the evidence, as requested by Defendant.  Doc. 480, p. 5(12).  Defendant asserts that the Government failed to prove that he knowingly and intentionally conspired or participated in a scheme to defraud, or that he devised, promoted, or profited from any scheme.  *Id.*  Defendant asserts that he notified appellate counsel by memorandum of his desire to raise this issue.  *Id.* and Ex. K (memo to Dennis Owens dated December 21, 2000).  There, Defendant advised his attorney that attorneys for codefendants Romain and Ferguson said that they thought Defendant had a sufficiency of the evidence argument, and a bailiff had "reported to friends of friends that he thought I was innocent from the testimony as well."  Ex. K.

Defendant asserts that he had no involvement in the financial investments or proposed returns, did not prepare or negotiate any agreements or make any representations to cause people to invest, and was only nominally compensated.  Doc. 481, p. 13.  Trial and appellate counsel are faulted for failing to advance these points.

court's conclusion that a Rule 6(e) violation is inevitable is unwarranted."  *Id.*, at 176.

*Id.* With regard to Prestige, Defendant asserts that an insufficiency of evidence argument would have been "enhanced" by the fact that summary judgment was granted in his favor in a civil case. *Id.* Defendant alleges that he avoided loss by interpleading the Atlantic Cruise funds, there was not sufficient intent or knowing participation, and counsel should have made this argument on appeal. *Id.*, pp. 13-14; doc. 550, pp. 4-10. "Defendant's association with the entire transaction was that of a nominally paid escrow agent." Doc. 550, p. 5. Defendant argues that "it would be impossible, in light of Pope's limited role, and limited financial participation, to conclude that he knowingly and intentionally participated in a scheme to defraud, to the extent required for a jury verdict." *Id.*, p. 8. Defendant also argues that Dennis Harrison's testimony was "weak" compared to his testimony and other evidence. *Id.*, pp. 9-10.

Defendant here is reiterating arguments already raised and rejected, and has not demonstrated ineffective assistance of counsel. As set forth above, it was brought out through testimony by Defendant and others that he acted as, and was compensated as, an escrow attorney. The fact that Defendant filed an interpleader on the Atlantic Cruise funds was brought out during trial. Doc. 141, pp. 26-27; doc. 282, pp. 58-59; doc. 284, pp. 48, 83. As previously addressed, it was noted throughout the trial and again in closing argument that summary judgment had been granted in Defendants' favor as to the Prestige funds.

But there was also testimony that an injunction was obtained the same day Defendant filed the notice of interpleader. Doc. 282, pp. 71, 76-78; doc. 285, pp. 44-47. There was testimony about other lawsuits, some not ending so favorably for Defendant or codefendants Kelly and Kaemmerling, though defense counsel elicited the nature of

the rulings (such as default or settlement) in mitigation.  *See* Doc. 277, pp. 97-99; doc. 278, pp. 168-169; doc. 279, pp. 248-249; doc. 280, pp. 59-76, 79-80; doc. 284, p. 115, 292-293; doc. 285, pp. 104-105, 127-133.

While Defendant asserts that Harrison's testimony was "weak" compared with his own testimony and other evidence, that was for the jury to decide.  Had the issue been raised on appeal, the evidence would have been viewed in the light most favorable to the Government, accepting reasonable inferences and credibility choices in favor of the Government.  Doc. 534, Ex. 1, p. 49, citing United States v. Majors, 196 F.3d 1206, 1210 (11th Cir. 1999).  The Government does not have to disprove every reasonable hypothesis of innocence, and a conviction will be affirmed if a reasonable fact finder could have found guilt beyond a reasonable doubt.  *Id.*  Defendant's belief that other testimony was weak, or repeating his interpretation of the evidence, does not demonstrate that this claim could have succeeded if raised on appeal.  *See* Doc. 534, Ex. 1, pp. 5-32 (summary of evidence and proceedings).  Therefore, Ground Nine affords no relief.

**Ground Ten**

Defendant asserts that appellate counsel failed to assert the insufficiency of the evidence as to the Prestige counts, counts 8, 11-16, of the indictment.  Doc. 480, p. 5(12).  He asserts that the only evidence was that which trial counsel negligently stipulated into evidence.  *Id.*, p. 5(13).  Defendant asserts that the defense presented evidence "that the 'Prestige' case had already been tried as a civil case in Federal Court in Chicag[o], with the Movant receiving a summary judgment in his favor.  That alone should have been sufficient to raise 'reasonable doubt' and sustain an insufficiency

argument on appeal." *Id.*  As Defendant asked appellate counsel to raise this and he did not, he "was thereby ineffective.  Success on these counts would have reduced the loss calculation at sentencing, thereby reducing Movant's prison term and his restitution." *Id.*

As set forth previously, Goolsby objected to use of the Prestige documents alone, presented without testimony, and the objection was overruled.  He again made the argument after the Government rested its case.  Defendant has not shown that this ruling was erroneous or subject to reversal on appeal, or that the conviction was subject to reversal based on insufficiency of the evidence, viewing the evidence in the light most favorable to the Government.

**Ground Eleven**

Defendant asserts in ground eleven that appellate counsel was ineffective for failing to argue insufficiency of the evidence on count 19, the "Atlantic Cruise" count, as he requested.  Doc. 480. p. 5(13).  Defendant asserts that:

> he interpled the [escrowed] funds into state court, and was dismissed from
> the civil action.  The parties to the agreements in question then settled
> their claims to the funds and divided the interpled funds.  It is illogical to
> conclude that Movant could be guilty beyond a reasonable doubt under
> these circumstances, and the sufficiency of the evidence to support such
> a verdict should have been tested on appeal.

*Id.*  Defendant asserts that the court relied on these funds in calculating the sentence and restitution.  Defendant asked appellate counsel to raise this argument on appeal. *Id.*, pp. 5(13)-5(14) and Ex. H (email to Owens of March 29, 2001).

Defendant's statement that it is "illogical" does not make it so, or demonstrate that a claim of insufficiency had any chance of success on appeal.  Interpleading the

funds does not negate prior criminal involvement in the fraud, particularly given the entry of an injunction the same day the notice of interpleader was filed. In the settlement, $233,000 was returned to Atlantic Cruise Ships of the $300,000 invested, with $67,000 going to Harrison (to be split with Kelly and Kaemmerling). PSR, ¶ 136. The amount owed in restitution was the $67,000. ¶ ¶ 136, 208. This was obtained as part of the fraud and was a loss to Atlantic Cruise. Ground Eleven is without merit.

**Ground Twelve**

Defendant asserts that his sentence was improperly calculated by consideration of amounts from Doit Inc., and Chernay International Inc., amounts which had been recovered by settlement and by a malpractice carrier, respectively. Doc. 480, p. 5(14).[28] Defendant asserts that only half the loss to Prestige should have been considered, as the other half went to a non-defendant firm in New York. *Id.* Defendant asserts that application of these erroneously included amounts reduces his liability in restitution and affects the sentencing calculation. *Id.*

This is not asserted as an ineffectiveness of counsel claim, and is a claim that could or should have been raised, if at all, on appeal. Defendant has not demonstrated any entitlement to relief on any theory (by showing cause and prejudice for the procedural default, or ineffective assistance of counsel). Under U.S.S.G. § 2F1.1 (1995),[29] the base offense level for the fraud was increased by 14 based on a loss or intended loss of more than $5,000,000 but less than $10,000,000. PSR, ¶ 155. If an

---

[28] Restitution for Doit was set at $500,000, to be reduced by any amount paid in the class action suit. PSR, ¶ 208.

[29] The 1995 version of the United States Guidelines Manual was used at sentencing, as subsequent versions were adverse to Defendants. Doc. 289, p. 34.

intended loss is greater than the actual loss, it should be used if greater than the actual loss.  § 2F1.1, comment (n. 7).  *See also* <u>United States v. Nosrati-Shamloo</u>, 255 F.3d 1290, 1291-92 (11th Cir. 2001) (citing this commentary, finding that where defendant had stolen mail and applied for credit cards with an aggregate credit limit of $43,000, that was the amount of intended loss for sentencing purposes).  The loss is not reduced by the amount reimbursed through insurance because this just shifts the loss to another victim.  <u>United States v. Daniels</u>, 148 F.3d 1260, 1262 (11th Cir. 1998) ("partial reimbursement . . . does not change the amount Daniels embezzled, it only substitutes Daniels' insurance company as another victim.").  The fact that money was transferred to a non-defendant financial firm does not thereby reduce the amount for purposes of the fraud or money laundering.  It was still an intended and actual loss to Prestige.  As noted at sentencing, funds were quickly disbursed from Defendant's escrow account to various accounts all over the world, beyond the ability of law enforcement to be traced.  Doc. 289, p. 20.[30]

Counsel filed written objections to the PSR.  Doc. 179.  Argument was made at sentencing as to the calculation of loss and grouping of offenses.  Doc. 289, pp. 7-14, 40-43, 47.  It was argued that this Defendant should be viewed differently from the others, because the money he received was earned as fees or was reimbursement for expenses.  *Id.*, p. 14.  It was argued that the total amount Defendant Pope received was $75,730.60, and that should be the amount used for sentencing.  *Id.*, p. 92.

---

[30] According to the PSR, ¶ 98, Defendant informed Prestige of its default and "closed" the account on his ledger on December 21, 1995, *then* caused the transfer of large portions of the funds to, *inter alia*, an account in New York.

Finally, any challenge to the restitution portion of a sentence is not cognizable under § 2255, because it does not go to the validity of custody.  Blaik v. United States, 161 F.3d 1341, 1343 (11th Cir. 1998) (quoting § 2255) ; Kaminski v. U.S., 339 F.3d 84, 87-89 (2nd Cir. 2003).  Ground twelve affords no relief.

**Ground Thirteen**

Defendant attempted to incorporate by reference every claim made by the codefendants.  Doc. 480, p. 5(14).  This was deemed to be improper pleading in the order to show cause, doc. 485, and this ground should not be considered by the court.

**Motion to Amend**

Through counsel, Defendant filed a motion to amend the § 2255 motion, seeking to raise new claims under Blakely v. Washington, *supra*.  Docs. 582 (motion), 583 (memorandum), and 584 (notice of supplemental authority).  *See also* United States v. Booker, __ U.S. __, 125 S.Ct. 738, 160 L.Ed.2d 621 (January 12, 2005).[31]

––––––––––––––––––––––

[31] In Blakely, the Court held that the relevant "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  542 U.S. at __, 124 S.Ct. at 2537 (emphasis in original).  The rationale was extended to the Federal Sentencing Guidelines in Booker.  125 S.Ct. at 749.  "The holding in *Booker* is that the Sixth Amendment right to trial by jury is violated where *under a mandatory guidelines system* a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury."  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005), *cert. denied*, __ S.Ct. __, 2005 WL 483174 (June 20, 2005); United States v. Burge, 407 F.3d 1183, 1191 (11th Cir. 2005) (quoting Rodriguez with original emphasis).  In the interim between Blakely and Booker, courts in this circuit were instructed to "continue to sentence pursuant to the Guidelines until such time as the Supreme Court rules on this issue," noting that oral argument was scheduled on October 4, 2004).  United States v. Reese, 382 F.3d 1308, 1312 and n. 2 (11th Cir. 2004).  Reese was vacated and remanded for further consideration, and ultimately for resentencing, in light of Booker.  Reese v. United States, __ U.S. __, 125 S.Ct. 1089, 160 L.Ed.2d (2005), *on remand*, United States v. Reese, 397 F.3d 1337 (11th Cir. 2005).

Defendant argues that <u>Blakely</u> is a new rule which should apply retroactively on collateral review.  Doc. 583, pp. 3-7.  Alternatively, Defendant argues that <u>Blakely</u> is not a new rule but explains the proper application of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which was misapplied here.  *Id.*, pp. 7-10.[32] Defendant asserts that failure to apply <u>Blakely</u> would result in a miscarriage of justice. *Id.*, pp. 10-11.  Defendant alleges that a <u>Blakely</u> type argument would have been summarily rejected prior to the <u>Blakely</u> opinion, that his § 2255 motion was timely filed, and the extraordinary nature of the new rule requires allowance of amendment to raise this claim under § 2255.  *Id.*, pp. 10-13.  Defendant raises various arguments as to why his <u>Blakely</u> claim should be considered timely under the one year limitations period for filing a § 2255 motion.  *Id.*, pp. 13-18.  Finally, Defendant asserts that, if this court determines that <u>Blakely</u> is not a new rule, but was dictated by precedent, then his claim is that counsel was ineffective for failing to raise the issue.  *Id.*, p. 19.

Binding precedent in this circuit holds that <u>Blakely</u> and <u>Booker</u> do not apply retroactively on collateral review.  <u>Varela v. United States</u>, 400 F.3d 864, 867 (11th Cir. 2005) (finding "essentially dispositive" the opinion in <u>Schriro v. Summerlin</u>, 542 U.S. __, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), that <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) announced a new rule of procedure which did not apply retroactively on collateral review[33]) (other citations omitted); *also citing* <u>McCoy v. United</u>

---

[32] An <u>Apprendi</u> objection was made at sentencing and overruled.  Doc. 289, pp. 52-53.

[33] In <u>Ring</u>, the Court concluded under <u>Apprendi</u> that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  536 U.S. at 589, 122 S.Ct. At 2432.

States, 266 F.3d 1245, 1256-58 (11th Cir. 2001) (holding that Apprendi did not apply retroactively on collateral review).  See also Guzman v. United States, 404 F.3d 139, 140 (2nd Cir. 2005) (agreeing with the Sixth, Seventh, Tenth, and Eleventh Circuits that Booker is not retroactive) (citing Varela, other citations omitted).  See also Lloyd v. United States, 407 F.3d 608, 615-616 (3d Cir. 2005) (joining the other circuits, collecting cases).  The motion to amend should be denied.

**Recommendation**

Accordingly, it is **RECOMMENDED** that the Court **ORDER** that attorney Michael Gates be permitted to withdraw as attorney for Defendant, and that Defendant's 28 U.S.C. § 2255 motion (doc. 480) and motion for summary judgment (docs. 550 and 551) be **DENIED WITH PREJUDICE**.  It is further **RECOMMENDED** that Defendant's motion to amend (doc. 582) be **DENIED**, and that Defendant's motions for release and for favorable decisions (docs. 593 and 619) be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on July 7, 2005.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**